JOHN C. COGGIN, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coggin v. Commissioner
Docket No. 36092-87
United States Tax Court
T.C. Memo 1993-209; 1993 Tax Ct. Memo LEXIS 215; 65 T.C.M. (CCH) 2623; May 17, 1993, Filed *215 For petitioner: J. William Rose, Jr. and John C. Coggin III. For respondent: Linda J. Wise. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) [1] and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Special Trial Judge set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: This case involves investments by petitioner as a limited partner in two partnerships, Energy Resources, Ltd. (ERL), and Virginia Partners, Ltd. (VPL). [2] The case is part of a larger group of cases identified by respondent as "McIntyre Coal Project - CN", a national litigation project involving coal mining partnerships promoted by an individual, Richard McIntyre (Mr. McIntyre). Respondent determined the following deficiencies *216 in petitioner's Federal income tax: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6661
1980
$ 56,518.98
[1] $ 2,825.95
--
--
--
1981
39,537.19
1,976.86
[2]
$ 10,385.92
--
1982
29,039.29
1,451.96
[3]
8,535.54
$ 7,259.82
In the notice of deficiency, respondent also determined that petitioner was liable for additional interest under section 6621(c) for the 3 years at issue. *217 The issues are: (1) Whether, under section 6501, respondent is barred from the assessment and collection of taxes against petitioner for the 3 years in question; (2) whether a coal mining lease transaction each partnership entered into was a sham or devoid of economic substance; (3) whether notes each partnership and its partners issued with respect to annual advance royalty payments due under lease agreements represented bona fide indebtedness; (4) whether each partnership was not engaged in an activity for profit; (5) whether annual payments each partnership agreed to pay under lease agreements were properly accrued and deducted as advanced royalties due under a minimum royalty provision described under section 1.612-3(b), Income Tax Regs.; and (6) whether petitioner is liable for additions to tax and the increased rate of interest. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioner was a resident of Birmingham, Alabama, at the time the petition was filed. Petitioner is an attorney. At one time, a significant portion of petitioner's practice was devoted to energy resources law. Beginning in 1974, petitioner performed legal work for clients in *218 the coal business. He drafted coal leases and advised clients on the acquisition of coal businesses. As a result of his legal work, petitioner acquired a generalized knowledge about the coal industry. Petitioner is also the author of three Bureau of National Affairs portfolios on taxation. He has represented clients before the Internal Revenue Service and is knowledgeable about the organization and structure of the Internal Revenue Service. He is aware of the separate functions of the collection and examination divisions of the Internal Revenue Service. From 1973 through 1978, petitioner practiced with a large law firm in Birmingham, Alabama. From 1978 through 1981, petitioner joined a smaller law firm, also at Birmingham. Since 1981, petitioner has practiced law on his own. While petitioner was with the large law firm, he became acquainted with Mr. McIntyre in the late 1970s. Petitioner performed most of the legal work done by that firm for Mr. McIntyre. Petitioner prepared the tax opinions included in the offering materials for various coal mining limited partnerships organized by Mr. McIntyre. When petitioner joined the smaller law firm, Mr. McIntyre followed petitioner *219 to that firm. Petitioner performed most of the legal work at that firm for Mr. McIntyre. Petitioner prepared and signed, on behalf of his law firm, the tax opinions included in the private placement offering materials for ERL and VPL, which offering materials are discussed more fully infra. Additionally, petitioner assisted Mr. McIntyre in negotiating the coal lease and sublease agreements of ERL and VPL. Petitioner was a limited partner in ERL and in VPL. During 1979 and 1980, ERL and VPL entered into respective lease agreements to mine and market, as lessee or sublessee, all of the minable and merchantable coal underlying certain land in Harlan County, Kentucky, and Lee County, Virginia. [3] These lease transactions were the subject of this Court's opinions in Walden v. Commissioner, T.C. Memo. 1988-98, and Bauman v. Commissioner, T.C. Memo. 1988-122. *220 In Walden v. Commissioner, supra (hereafter sometimes referred to as the Walden case or Walden), and Bauman v. Commissioner, supra (hereafter sometimes referred to as the Bauman case or Bauman), this Court held that the royalty obligations of each partnership under its respective lease agreements were not "substantially uniform" and were not "paid at least annually" and, thus, were not deductible as advance royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs. The Court, in these cases, granted respondent's motions for partial summary judgment on the minimum royalty provision issue. The opinions in Walden and Bauman were limited to the question whether the royalty obligations qualified under a minimum royalty provision as envisioned by section 1.612-3(b), Income Tax Regs.
VPL
VPL was organized on December 4, 1978, as a Florida limited partnership. Investors were solicited through a Confidential Private Placement Memorandum dated January 1, 1979 (the offering materials or offering memorandum). Mr. McIntyre was VPL's managing *221 general partner. The offering memorandum stated that VPL's primary business was "acquiring and exploiting the rights to mine and remove all of the minable and merchantable coal from four seams of coal located beneath approximately 8,000 acres in Lee County, Virginia and Harlan County, Kentucky * * * and [preparing and marketing such coal]". The offering memorandum contained a number of attachments, which included: (1) VPL's Limited Partnership Agreement, (2) Sublease Agreement/Partnership Promissory Notes, (3) Geologist's Report, (4) Tax Opinion, and (5) Accounting Projections. The VPL Limited Partnership Agreement provided that the partnership's general partners would include a managing general partner and an associate general partner, with the managing general partner being Mr. McIntyre, and the associate general partner being Charles McIntyre. Each was stated to have paid $ 500 for his interest as a general partner. Although not explicitly stated, it was anticipated that Mr. McIntyre and Charles McIntyre, in all likelihood, were to be VPL's only general partners for the foreseeable future. Under the offering materials, a maximum of 274 units was offered to prospective investors; *222 however, the offering could be closed at the option of the sponsor (Mr. McIntyre) at a minimum of 200 units. An investor was required to purchase two units, except that the sponsor could sell a single unit to a maximum of 35 investors. If the maximum number of units sold, each investor would pay for two units, in cash and notes, $ 159,127. If only the minimum of 200 units sold, each investor would pay for two units, in cash and notes, $ 203,204. Thus, the total contributions of cash and notes to VPL would be $ 21,800,399 if the maximum 274 units subscribed and $ 20,320,400 if the minimum 200 units subscribed. The investment for two units was payable as follows: Maximum Offering
Minimum Offering
Cash [1]
$  40,000
$  40,000
Notes & assumption agreements [2]
119,127
163,204
$ 159,127
$ 203,204
*223 Thus, the notes and assumption agreement of all investors totaled $ 16,320,400. Subject to conditions not pertinent here, the limited partners were allocated 99 percent of the partnership's profits and losses, and 1 percent was allocated to the general partners. These allocations would change in later years based upon cash flow distributions and other situations also not pertinent here. Management of the partnership's activities was solely in the managing general partner. Of the total cash contributions by the limited partners during 1979 and 1980, 25 percent was to be paid to the managing general partner as an acquisition fee out of which, however, the managing general partner would pay the expenses incurred in connection with the syndication. The managing general partner would also receive a management fee of $ 1 per ton of coal mined by or for the partnership if the partnership realized a profit of at least $ 4 per ton of coal sold. However, the management fee terminated once the limited partners received cash distributions equal to their original cash contributions. Investors were advised in the offering materials that all partners, including general partners, were free *224 to engage in or own other independent business ventures, including ventures which would compete with the partnership's activity. In fact, other ventures were named in the offering materials in which Mr. McIntyre was engaged which would compete with VPL as well as occupy Mr. McIntyre's time. Under the sublease agreement of coal property which VPL was to subsequently enter into pursuant to a prior contract dated November 15, 1978, between Mr. McIntyre on VPL's behalf and the sublessors, VPL, as sublessee, would mine and market all of the minable and merchantable coal underlying approximately 8,000 acres of land in Lee County, Virginia, and Harlan County, Kentucky. In addition, VPL would purchase from the sublessors two corporations, the assets of which included coal mining and loading equipment. The sublease was for a primary term of 20 years, unless, in the sole judgment of VPL, the economically recoverable coal was exhausted sooner, in which event the sublease was terminable. The sublease could be extended beyond 20 years, on a year-by-year basis, at VPL's election, until such time as all merchantable coal had been extracted from the properties; however, such extensions could *225 not go beyond the primary terms of the underlying leases affecting the coal property, which terms were 40 years with renewal terms of 40 years. See Walden v. Commissioner, T.C. Memo. 1988-98. Under the sublease, VPL was obligated to pay the sublessors a production royalty of 4 percent of the gross sales price, f.o.b. mine, per ton of coal mined from the coal properties. VPL was also obligated to pay additional production royalties on the underlying leases of 75 cents per ton of coal mined and sold from the leased premises.[4] Irrespective of production, VPL was obligated to pay advanced royalties, annually, subject to credits from production. These advanced royalty obligations were payable in cash and promissory notes as follows: For the first year (1979), cash of $ 240,000 and Partnership Recourse Promissory Note of $ 8,100,200; for the second year (1980), cash of $ 120,000 payable at the rate of $ 10,000 per month during 1979, and Partnership Recourse Promissory Note of $ 8,220,200 to be executed by VPL on or before the 1980 anniversary date of the lease; for the third year (1981), $ 120,000 cash payable $ 10,000 per month beginning one month after *226 the sublease's first anniversary date of the sublease, and a nonrecourse note of $ 8,220,000; and for all subsequent years, a nonrecourse note of $ 8,340,000 to be executed before each anniversary date of the sublease. See Walden v. Commissioner, supra.As noted earlier, as part of their capital contributions to VPL, the limited partners assumed personal liability for and separately executed notes in favor of VPL totaling $ 16,320,400 for the recourse notes of $ 8,100,200 and $ 8,220,200 executed by VPL for the advanced royalty obligations for the first 2 years of the lease. For the 20 years, the cash and note obligations of VPL to its sublessor totaled $ 166,800,000. All of the notes were payable 20 years after date, subject to credits for prior production payments; however, each note's maturity date could be extended, at the option of either the maker or payee, for an additional 10 years. *227 Other than the payments due from production, no other cash payments were required on the notes prior to maturity. Each note provided that no principal payments were due until after all earlier executed notes had been paid in full. The notes bore interest at 6 percent per annum, from maturity. No interest would accrue or be payable prior to the maturity of each note. The maturity date of each recourse note would not change if the sublease were terminated prior to its primary term. All of the notes were secured by the coal reserves underlying the leased property. The geologist's report submitted with the offering materials was on land which included at least another 1,500 acres of coal property in addition to the approximately 8,000 acres of coal property which would be covered under the VPL sublease. The report did not specify what portion of the total 44 million to 45 million tons of recoverable coal reserves estimated lay on the 8,000 acres of land which would be subject to the VPL sublease. Further, the report generally did not give any opinion as to whether the estimated coal reserves were economically recoverable or whether mining of the coal would be profitable. The *228 offering materials disclosed that the individual who prepared the report was an employee of another coal partnership which had previously been organized and operated by Mr. McIntyre. The tax opinion, dated January 2, 1979, which was part of the offering materials, had been issued by the second law firm with which petitioner had become associated and was addressed to Mr. McIntyre as managing general partner of VPL. The opinion noted that Mr. McIntyre represented that the coal properties subleased to VPL contained at least 40 million tons of economically recoverable coal reserves based upon a 65 percent recovery factor as determined in consulting engineering reports obtained by VPL; that the production and minimum advance royalties to be paid by VPL were not in excess of royalties for similar leases in the Lee County, Virginia area; that the fair market value of VPL's sublease was well in excess of the total minimum royalties to be paid to the sublessor; and that, based on the reserve estimate, the minimum advance royalties should be substantially less than the total royalties to be paid under the sublease. The tax opinion stated that none of these representations had been independently *229 verified. Petitioner prepared and signed the tax opinion on behalf of his law firm. The accounting projections submitted with the offering materials included: (1) An estimate of VPL's taxable losses for 1979 and 1980, and (2) an analysis of estimated VPL mining operations during the period from 1979 through 1998. It was estimated that VPL would realize a net loss of $ 8,400,200 for 1979 and $ 7,460,200 for 1980 if the minimum number of partnership units subscribed, 99 percent of which was allocated to the limited partners. Based on the cash contributions of the limited partners, the ratio of the tax deductions to the cash capital contributions of the limited partners was 415 percent and 369 percent, respectively, for 1979 and 1980. In the mining analysis projection, VPL would sell $ 2,018,750 of coal annually during the period from 1983 through 1998. Each of the projections, however, stated that the estimates used in the projection were hypothetical and were not warranted or guaranteed. Other disclosures in the offering materials were that, in the period from 1963 through 1978, Mr. McIntyre had been the president of a company that specialized in tax incentive investments and *230 which also conducted a discounted commissions stock brokerage business; that Mr. McIntyre had limited experience in the coal mining business; and that, in 1976, Mr. McIntyre had participated in the opening of a mining venture in the Appalachian coal fields. VPL entered into a sublease agreement, dated April 20, 1979, and an amendment of lease, dated April 20, 1979, along the lines discussed above. As part of the sublease transaction, VPL also purchased the outstanding shares of two corporations owned by the sublessors which owned certain coal mining equipment. VPL was issued certain mining permits during 1980. VPL had previously entered a mine operating agreement dated June 29, 1979. In an agreement dated April 22, 1981, VPL agreed to employ two contract miners to develop and operate a mine at another location. The record is unclear whether this mine was on another portion of the VPL coal property. VPL also purchased and resold coal from outside producers at the coal tipple facility which VPL acquired from its sublessor. One of its customers, from whom VPL purchased coal, was ERL. The operator of the scales at the tipple or an employee of VPL generally negotiated the purchase *231 price. However, where VPL purchased coal from ERL, Mr. McIntyre determined the purchase price. By 1982, active mining operations on the VPL coal property wound down. No further active mining operations were conducted. During 1980, VPL distributed $ 200,000 to its partners. VPL was subsequently sued by its sublessors in the Federal District Court for the Western District of Virginia. In its decision and order dated September 4, 1987, the District Court found that VPL was in default on its April 20, 1979, sublease agreement, and the sublease was rescinded. ERL
ERL was a Tennessee limited partnership. Investors were solicited through a private placement memorandum (the offering memorandum or offering materials) dated October 1, 1980. The offering materials represented that a restated certificate and limited partnership agreement for ERL, dated October 1, 1980, would be filed with the appropriate Tennessee authorities. Included with the offering materials were a number of attachments: (1) ERL's Restated Certificate and Limited Partnership Agreement, (2) Lease Agreement/Partnership Promissory Notes, (3) Coal Reserve Report, (4) tax opinion, and (5) accounting projections. *232 The ERL offering materials were similar to the VPL offering materials, except that the ERL offering was a much larger project than the VPL project. ERL's managing general partner was Mr. McIntyre and the associate general partner was Charles McIntyre. The offering materials stated that ERL was organized to "lease certain coal properties in Harlan County, Kentucky, consisting of 3,520 acres of fee simple coal properties, 380 acres of coal rights and certain surface rights", and that ERL would earn future income for its partners by exploiting its rights under the lease. Under the offering materials, 200 limited partnership units were offered to prospective investors. The minimum investment was one unit per investor; however, at the discretion of the sponsor (Mr. McIntyre), fractional partnership units could be sold to a maximum of 35 investors. The capital contribution for each unit was $ 190,000, consisting of $ 45,000 cash payable in three installments and execution by each investor of a note in the amount of $ 145,000 payable to ERL representing the proportionate personal liability of each investor for three recourse notes executed by ERL to the lessor of the coal property *233 totaling $ 29,000,000 for minimum advanced royalties for the first 3 years on the leased property. Thus, the total capital contributions by limited partners for the 200 units in ERL, cash and notes, totaled $ 38,000,000. See Bauman v. Commissioner, T.C. Memo. 1988-122. The ERL partnership agreement allocated 99 percent of the profits and losses of the partnership to the limited partners and 1 percent to the general partners, subject to the same terms and conditions in the VPL partnership agreement. Management of the partnership's business was also in the managing general partner, Mr. McIntyre. ERL's partnership agreement, and as disclosed in the offering materials, provided that the managing general partner would be paid an acquisition fee equal to 22 percent of the total cash contributions made by the limited partners to the partnership in 1980, 1981, and 1982. The managing general partner was responsible for paying all costs related to ERL's formation and to the sale of ERL partnership interests. In addition, the managing general partner was entitled to a management fee equal to $ 1 per ton of coal mined by or for the partnership. The management *234 fee, however, was payable only if ERL realized a profit of $ 4 per ton of coal sold and would terminate once the limited partners received cash distributions equal to their total 1980, 1981, and 1982 cash contributions to ERL. Under the lease agreement ERL was to enter into, ERL, as lessee, would mine and market all of the minable and merchantable coal underlying a specified tract of land in Harlan County, Kentucky. [5] In addition, ERL, would also lease certain mining equipment from the same lessor. The lease was for a primary term of 30 years, unless, in the sole judgment of ERL, the economically recoverable coal was exhausted sooner, in which event the lease was terminable. The lease could be extended beyond 30 years, on a year-by-year basis, at ERL's election, until such time as all merchantable coal had been exhausted from the properties. Bauman v. Commissioner, T.C. Memo. 1988-122. *235 Under the lease, ERL was obligated to pay its lessor a production royalty of 8 percent of the gross sales price, f.o.b. rail car, per ton of coal mined from the leased properties. A separate consideration, it was agreed, would be paid for the leased mining equipment. Irrespective of production, ERL was obligated to pay to its lessor advanced royalties, annually, subject to credits from production. These advanced royalty obligations were in the amount of $ 10,000,000 each year, beginning on the date of execution of the lease, and thereafter on each annual anniversary date, for the life of the lease, or 20 years, whichever was less. The annual obligation was to be discharged as follows: For the first year (1980) payment, $ 750,000 cash and a recourse promissory note of $ 9,250,000; for the second year (1981) payment, $ 250,000 cash and a recourse promissory note of $ 9,750,000; for the third year (1982) payment, a recourse note of $ 10 million; and for the fourth and all remaining anniversary payments, a nonrecourse note of $ 10 million each year. Bauman v. Commissioner, supra.The $ 145,000 notes executed by the limited partners for each partnership *236 unit, totaling $ 29 million, represented the personal liability of the limited partners for the first three annual recourse notes of ERL for advanced minimum royalties. The total liability of the partnership, however, to its lessor for advanced royalties in cash and notes for the life of the lease totaled $ 200 million. All of the notes were payable 20 years after date, subject to prior payments; however, each note could be extended, at the option of either the payee or the maker, for an additional 10 years. The notes bore interest at 6 percent per annum. No partner of ERL would assume personal liability for payment of the interest due under the notes. The maturity date of each recourse note would not change if the lease were terminated prior to its primary term. All of the notes were secured by the coal reserves underlying the leased properties. The lessor under the proposed lease agreement with ERL had acquired ownership of the coal property in a July 30, 1977, transaction for a stated cash price of $ 3,750,000. A copy of the July 30, 1977, deed of conveyance to the lessor was included in the offering materials. As stated earlier, the offering materials included a Coal *237 Reserve Report on ERL's leased properties. However, not included in the offering materials was another report dated March 14, 1975, by the same firm which prepared the Coal Reserve Report in which the coal property was valued at approximately $ 3.5 million. The individual who prepared and signed the Coal Reserve Report later became an employee of ERL. This individual also performed other work for the coal partnerships organized and operated by Mr. McIntyre. It was represented in the offering materials that the major reserves on ERL's leased coal property would be in the Mason, Harlan, and Wallins Creek coal seams, with the stated objective of developing "the Mason, Harlan and Wallins Creek coal seams and then to develop other seams as practicable". The Coal Reserve Report, however, computed no estimated recoverable coal reserves for the Wallins Creek seam. The report stated that the Wallins Creek seam had already been extensively mined. The Coal Reserve Report also made reference to two prior reports prepared on the coal property, the 1975 report done by the same firm and a 1979 report done by another firm. As noted in the Coal Reserve Report, both of the two prior reports *238 also computed no estimated coal reserves for the Wallins Creek seam. The Coal Reserve Report estimated that the property had approximately 52,604,105 tons in total potential coal reserves, consisting of 23,593,665 in calculated recoverable reserves and 29,010,500 tons in possible additional reserves. It stated, however, that additional exploration was needed to verify and expand on the 29,010,500 tons possible additional reserves figure. The Coal Reserve Report generally did not determine whether it would be profitable to mine the estimated coal reserves. It advised that, "before an accurate determination of probable profitability is made, an in-depth study is needed". Petitioner's law firm issued the tax opinion which was included with the offering materials. Petitioner prepared and signed the tax opinion on behalf of the law firm. The tax opinion recited that certain representations had been made to the law firm by ERL's managing general partner, Mr. McIntyre, which included the following: (1) The coal property having a minimum of 52 million tons of economically recoverable coal reserves, (2) the partnership having the capability to generate sufficient revenue from its mining *239 of the coal to discharge its minimum royalty obligations under the lease, (3) the partnership's royalty obligations under the lease being structured in accordance with customary business practice and reflecting a commercially reasonable royalty rate, and (4) the partnership's interest under the lease having a fair market value substantially exceeding ERL's minimum royalty obligations. The tax opinion stated that the law firm had not attempted to independently verify many of these representations of Mr. McIntyre. As in the VPL offering materials, the ERL offering materials represented that ERL's managing general partner's experience in the coal mining business was limited, noting that Mr. McIntyre was involved as a general partner in other mining partnerships, and that these other ventures might compete with ERL for Mr. McIntyre's time. The accounting projections submitted with the offering materials included: (1) An estimate of ERL's taxable income for 1980, 1981, and 1982, and (2) an analysis of estimated ERL mining operations during the period from 1980 through 2009. It was estimated that, for 1980, ERL would realize a net loss of $ 10,105,000; a net loss of $ 9,200,000 for *240 1981; and a net loss of $ 7,712,500 for 1982. Under the partnership agreement, 99 percent of these losses were allocable to the limited partners. Based on the cash capital contributions by the limited partners for each of the 3 years, the ratio of the tax deductions to the cash capital contributions was 333 percent, 304 percent, and 255 percent, respectively, for 1980, 1981, and 1982. In the mining analysis projection, ERL would sell in excess of two million tons of coal annually during the period from 1989 through 2009. Each of the projections, however, stated that the estimates used were hypothetical and were not warranted or guaranteed. ERL entered into a lease agreement dated December 1, 1980, along the lines discussed above. As part of the lease transaction, ERL also entered an equipment lease agreement dated December 1, 1980, with the lessor under its coal lease. In 1980 and 1981, ERL was issued a number of mining permits. Six of the permits were for strip mines and two were for deep mines on the ERL coal property. Two of the mines never were operated. The other six mines produced a total of approximately 167,000 tons of coal. These mines ceased operation by the end *241 of 1981. No other coal was produced from the ERL property. The mine sites were never reclaimed and restored to their original premining condition, and ERL eventually forfeited the reclamation bonds it had provided to obtain the mining permits. ERL also leased a tipple facility which was located on land adjacent to the ERL coal property. Another coal mining partnership organized by Mr. McIntyre leased the coal mining rights to the land on which the tipple was located. This other partnership sold the coal it mined from the land to ERL. The terms of the coal sales between ERL and the other partnership were determined by Mr. McIntyre. VPL, ERL and petitioner's tax returns
On partnership information returns for 1980, 1981, and 1982, the coal activities of the partnerships were reported as follows: VPL
1980 1981 1982 Income:
Gross sales
$ 1,472,655 $   244,982 $    27,922 Less cost of goods sold
(692,138)
(56,341)
--
Interest & other income
357,108 472,555 130,488 Total income
$ 1,137,625 $   661,196 $   158,410 Deductions
9,385,878 9,459,407 8,661,882 Ordinary income (loss)
($ 8,248,253)
($ 8,798,211)
($ 8,503,472)
*242 ERL
1980
1981
1982
Income:
Gross sales
$    267,071 $  5,164,506 $     11,338 Less cost of goods sold
(107,022)
(4,630,734)
--
Interest & other income
7,744 234,415 287,721 Total income
$    167,793 $    768,187 $    299,059 Deductions
10,214,402 13,398,875 11,017,920 Ordinary income (loss)
($ 10,046,609)
($ 12,630,688)
($ 10,718,861)
VPL and ERL were on the accrual basis of accounting. The losses reported for each year included deductions taken for the notes executed by each partnership to its respective lessors for the minimum royalty payments due under the terms of each lease/sublease. In accordance with the partnership agreements, petitioner was allocated the following losses by the partnerships for the years indicated on Schedules K-1 filed by VPL and ERL: 1980
1981
1982 VPL
$ 40,829
$ 21,775
[1] $ 21,046
ERL
49,731
62,522
[2] 53,059
*243 On his individual income tax returns for 1980, 1981, and 1982, petitioner claimed all the losses shown above from VPL and ERL except that, on his 1982 return, petitioner did not claim any loss from VPL for reasons which are not explained in the record. Additionally, petitioner did not claim on his 1982 return the section 1231 losses shown above from VPL and ERL. In the notice of deficiency, respondent disallowed the following amounts with respect to the two partnerships: 1980
1981
1982
VPL
$ 43,629
$ 23,411
$    392
ERL
49,731
62,522
53,059
Statute of limitations, notice of deficiency, and petition
Petitioner's 1980, 1981, and 1982 individual returns were audited by the Examination Division of the Internal Revenue Service District Director's Office at Birmingham, Alabama. By 1984, examination of these returns had been assigned to Donna McCurry, a revenue agent in the Examination Division of the Birmingham office. In a letter dated August 15, 1984, to Ms. McCurry, petitioner stated that "This should conclude all of the items that you need to bring the examination of my 1980 and 1981 tax years to a conclusion which I believe is in order after three (3) *244 revenue agents and over two (2) years of examination." During the course of the audit, which extended over a period of time, petitioner and respondent executed a series of written agreements which extended the period of assessment of tax for the 3 years in question as authorized under section 6501(c)(4). All of the agreements were executed on behalf of the Birmingham District Director by various group managers or supervisors in the Examination Division. The last of such agreements with respect to petitioner's 1980 and 1982 tax years was on separate Internal Revenue Service Form 872-A, Special Consent to Extend the Time to Assess Tax. The Form 872-A for 1980 and the Form 872-A for 1982 contained identical provisions concerning the extension of the time to assess tax, as follows: (1) The amounts of any Federal Income tax due on any returns made by or for * * * [Mr. Coggin] for the periods ended * * * [specified as December 31, 1980, in the case of the 872-A executed for 1980, and as December 31, 1982, in the case of the 872-A executed for 1982] may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form *245 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayers; or (b) the Internal Revenue Service mails Form 872-T to the taxpayers; or (c) the Internal Revenue service mails a notice of deficiency for such periods; except that if a notice of deficiency is sent to the taxpayers, the time for assessing the tax for the periods stated in the notice of deficiency will end 60 days after the period during which the making of an assessment was prohibited. (2) This agreement ends on the earlier of the above expiration date or the assessment of an increase in the above tax or the overassessment date of a decrease in the above tax that reflects the final determination of tax and the final administrative appeals consideration. * * *
The last extension agreement between petitioner and the Birmingham District Director's office was with respect to taxable year 1981. The extension for 1981 was on Internal Revenue Service Form 872, Consent to Extend the Time to Assess Tax, and that extended the period for assessment to September 30, 1987. The agreement provided, in pertinent part, as follows: (1) The amount of any Federal Income tax due on any returns *246 made by or for * * * [Mr. Coggin] for the periods ended December 31, 1981 may be assessed at any time on or before September 30, 1987. However, if a notice of deficiency in tax for any such periods is sent to the taxpayers on or before that date, then the time for assessing the tax will be further extended by the number of days the assessment was previously prohibited, plus 60 days. (2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration. * * *
Marilyn Toney was a revenue officer in the Collection Division of the Birmingham District Director's office. Revenue officers do not examine returns. As a revenue officer, Ms. Toney's duties were to collect delinquent taxes and to secure delinquent returns. Cases assigned to revenue officers for the purpose of collecting unpaid taxes are referred to as Taxpayer Delinquent Accounts (TDA's). On assignment of a TDA, the revenue officer receives a file with a history sheet and a TDA card, which is a summary sheet approximately 8-1/2 inches by 5 inches. The information summarized *247 includes the taxpayer's name and address; the taxable period covered; the amount due, including penalties and interest; and the dates letters were sent to the taxpayer by the Internal Revenue Service Center, including the final notice and demand for payment. A code on the TDA card also indicates whether the tax liability assessed was based on a return filed by the taxpayer or resulted from an examination of the return. Ms. Toney was assigned a case to collect against petitioner, as a TDA, the amount of $ 2,526.36 in income taxes which had been assessed against him for 1980. The assessed liability involved an adjustment which petitioner had agreed to in the course of the audit of his returns for the 3 years at issue. Petitioner waived any restrictions on the assessment and collection of the liability attributable to this particular adjustment and agreed to immediate assessment and collection by the Internal Revenue Service. Ms. Toney visited petitioner's office on January 15, 1986. Since petitioner was not available on that date, Ms. Toney left her business card, advised petitioner's secretary that she was a revenue officer with the Internal Revenue Service, and requested that *248 petitioner contact her. In January or February of 1986, Ms. Toney had a telephone conversation with petitioner. She advised him of the balance due on his assessed tax liability for 1980 and gave him a deadline for payment. On or about February 10, 1986, petitioner made full payment with respect to the assessed 1980 tax liability sought by Ms. Toney. Except for this assessed item, Ms. Toney did not discuss with petitioner anything about the continuing audit of petitioner's 1980, 1981, and 1982 income tax returns. A letter dated July 9, 1986, from the Birmingham District Director to petitioner enclosed an examination report on petitioner's tax liabilities for 1980, 1981, and 1982. The letter stated that adjustments in petitioner's returns for 1980, 1981, and 1982 were believed to be necessary. This letter is commonly referred to as a "30-day letter". It advised that, if no response was received from petitioner within 30 days, his case would be processed on the basis of the adjustments shown in the examination report. The July 9, 1986, 30-day letter advised petitioner as follows concerning any response: In Reply Refer to: 435: RN Person to Contact: Victoria Knowe *249 Contact Telephone Number: (205) 731-1293
Petitioner responded to the 30-day letter by a letter dated July 21, 1986, which he addressed and referenced as follows: Victoria Knowe Mail Stop 214 Internal Revenue Service Center
500-22nd Street South Birmingham, Alabama 35233 Re: Reply Reference Code: 435:RN
In the letter, petitioner stated his general objections to the findings contained in the examination report and requested a conference with the appeals office. In a letter dated August 28, 1986, to Victoria Knowe, petitioner noted their prior telephone conversation concerning a written protest which petitioner intended to file. The letter was addressed and referenced in the same manner as petitioner's July 21, 1986 letter. In this letter petitioner confirmed that he would file a protest by September 30, 1986. Petitioner filed a written protest dated September 26, 1986, which discussed in more detail his objections to the examination report. The protest was addressed and referenced: District Director Internal Revenue Service
500-22nd Street South Birmingham, Alabama 35233 Attention: Victoria Knowe Re: Your Reply Reference: 435:N
*250 The protest stated that petitioner wished to appeal the adjustments proposed in the 30-day letter and, to that end, requested a conference with the Region Appeals staff and the transfer of his case to the appropriate Internal Revenue Service Appeals Office for further consideration. On October 6, 1986, less than 2 weeks after filing his protest, petitioner prepared and signed two Internal Revenue Service Forms 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax. On one Form 872-T, petitioner listed the tax covered as income tax for 1980; on the other 872-T, he listed the tax covered as income tax for 1981 and 1982. Petitioner enclosed the two completed forms with an accompanying letter, dated October 6, 1986, which he addressed to Marilyn Toney, the collection agent for the Internal Revenue Service. The letter was mailed on October 8, 1986, by certified mail, return receipt requested. The envelope and enclosed letter of transmittal were addressed as follows: Ms. M. Toney Internal Revenue Service
Revenue Agent Internal Revenue Service
500-22nd Street South Room 330 Birmingham, Alabama 35233
The green Postal Service return *251 receipt form attached to the outside of the mailing envelope and which was to be returned to petitioner, however, contained the following information under the heading "Article Addressed to": Ms. M. Toney IRS/Attn: Chief - Exam Div.
500 22nd St. S B'ham, Ala 35233
The transmittal letter to Ms. Toney read: Dear Ms. Toney: Enclosed please find the Forms 870-T [sic] for my file which you suggested I return to you some time ago. Thank you for your assistance in connection with the conclusion of my case. Very truly yours, /s/ John C. Coggin, III
Contrary to petitioner's claim, no routing memorandum slip requesting that Ms. Toney forward the enclosed Forms 872-T to the Chief of the Examination Division was attached to or enclosed with the letter sent to Ms. Toney. The Form 872-T provided by the Internal Revenue Service (including the two Forms 872-T which petitioner completed and mailed to Marilyn Toney) advises the preparer that mailing instructions are contained on the back of the form. These mailing instructions, in pertinent part, state that the Form 872-T should be mailed as follows: If the tax returns to which this notice applies is under *252 consideration by the Examination Division, mail this notice to the District Director of Internal Revenue having jurisdiction over the return(s), Attention: Chief, Examination Division. * * * If the tax returns to which this notice applies is under consideration by Appeals, mail this notice to the Chief, Appeals Office, having jurisdiction over the returns
Petitioner's correspondence containing the Forms 872-T was delivered to the mailroom of the Birmingham District office on October 14, 1986. The Internal Revenue Service employee on duty in the mailroom signed a Postal Service form submitted to her by the postal carrier, acknowledging receipt of all the certified mail listed thereon. The Internal Revenue Service employee made a copy of the Postal Service form listing the items of certified mail delivered to her, then returned the original form to the postal carrier. The Internal Revenue Service employee also signed the return receipt form attached to the outside of the envelope containing petitioner's letter and the Forms 872-T. The return receipt form was detached from the envelope and given to the postal carrier. The Internal Revenue Service employee did not make a *253 copy of the return receipt. The return receipt was received by petitioner in due course, confirming delivery of his certified letter. After mail is received at the Birmingham district office, mailroom employees go over the copy of the certified mail list, on which they annotate next to each name the mail stop or room to which each item of mail is directed. In the case of certified mail, a note is placed in a box at the mailroom advising the addressee-recipient of a certified letter to be picked up. The Birmingham district office has approximately 55 to 60 mail stops or rooms to which mail is directed. The employee who annotated the certified mail list in the processing of petitioner's certified letter personally knew Marilyn Toney and knew that her office was in room 310 and was not in room 330, as petitioner's letter was addressed. Accordingly, the mailroom employee wrote "310" on the envelope, and a note was left in box 310 advising that a certified letter was to be picked up. Subsequently, a clerk for the revenue officer group in room 310 picked up the certified mail addressed to Marilyn Toney from petitioner. On receiving the correspondence, Ms. Toney opened the envelope *254 and found petitioner's October 6, 1986 letter and the two Forms 872-T. Form 872-T is not used in the Collection Division. Ms. Toney was not familiar with this form and was unaware of its purpose. After determining that she did not have an open case for petitioner, Ms. Toney placed the envelope, letter and all enclosures, in her "To be associated" file in anticipation that she would be assigned a case involving petitioner. Ms. Toney maintained this file because she frequently received correspondence on a case prior to the time that case was formally assigned to her. This would usually occur when a taxpayer would find out in advance which revenue officer would be assigned their case. Petitioner's correspondence remained in Ms. Toney's "To be associated" file until July 1, 1987. Meanwhile, on November 17, 1986, Benjamin Whitten, an appeals officer in the Internal Revenue Service's Birmingham appeals office, was assigned to consider petitioner's 1980, 1981, and 1982 returns, presumably pursuant to petitioner's protest and request for consideration of his case by the appellate division. On or about November 21, 1986, Mr. Whitten telephoned petitioner and asked whether petitioner *255 intended to accept the settlement offer the Internal Revenue Service had extended to investors in ERL and VPL. Petitioner was familiar with the settlement offer based on certain prior cases he had settled with Mr. Whitten. The terms of the settlement offer had previously been discussed and negotiated with petitioner, as he represented a number of investors in the coal partnerships organized by Mr. McIntyre in cases before the Birmingham appeals office. The settlement offer allowed investors in ERL and VPL deductions to the extent of their cash investment in those partnerships. Petitioner indicated to Mr. Whitten that he intended to accept the offer for himself. Mr. Whitten requested that petitioner provide documentation of the cash payments petitioner had made to ERL and VPL. This information, however, was not immediately provided by petitioner. In a January 29, 1987, letter, Mr. Whitten again extended the same settlement offer. That letter required a response from petitioner within 30 days. Petitioner asked Mr. Whitten for several extensions of time in order to obtain substantiation of his cash payments. In a conversation with petitioner in April 1987, Mr. Whitten advised *256 petitioner that the statute of limitations on assessment and collection for 1981 would expire after September 30, 1987, and that, if petitioner was unable to provide substantiation and conclude a settlement prior to September 30, 1987, execution of another agreement to further extend the statute of limitations for 1981 would be necessary. Petitioner stated that he did not want to further extend the statute of limitations and wished to conclude the case. Subsequent to receiving the requested substantiation from petitioner, Mr. Whitten, in a letter dated May 28, 1987, sent various documents for petitioner to execute to settle the case. Mr. Whitten subsequently telephoned petitioner's office to inquire about the documents but was advised by petitioner's secretary that petitioner was out of the country. By letter dated June 22, 1987, petitioner's secretary requested Mr. Whitten furnish her with copies of the agreements which had been executed to extend the period of limitations for 1980, 1981, and 1982. Her letter, in pertinent part, stated: In view of your expressed desire to expedite the settlement of Mr. Coggin's personal tax case and in Mr. Coggin's absence I am attempting *257 to organize his personal tax files for his immediate review upon his return. In the process of organizing these files I find that we do not have a copy of the Form 872s extending the statute of limitations as executed by the Government. I assume that Mr. Coggin will want to follow our standard procedure when settling a tax case and request a copy of all outstanding Form 872s as executed by the Government. In order to expedite his review of the proposed settlement documents and to complete our files, please forward us a copy of the same so that I may place them in the file prior to his return.
Mr. Whitten responded and sent the requested copies of the agreements. On June 29, 1987, petitioner's secretary advised Mr. Whitten by telephone that, in reviewing petitioner's tax files, she had discovered copies of Forms 872-T mailed earlier to the Internal Revenue Service. The secretary stated she had brought this to petitioner's attention and that petitioner, who was still out of the country, had instructed her to inform Mr. Whitten about the Forms 872-T. Mr. Whitten requested that he be provided with copies of the Forms 872-T and other pertinent documents, as he did not have *258 such information in his files. On July 1, 1987, Mr. Whitten received from petitioner's secretary copies of the Forms 872-T and a copy of the return receipt form that had accompanied petitioner's October 6, 1986 certified letter to Ms. Toney. After examining the copy of the return receipt, Mr. Whitten consulted his Birmingham district directory and determined that the only "Ms. M. Toney" employed in the Birmingham district office was Marilyn Toney. Mr. Whitten then visited Ms. Toney at her office in the Collection Division. Mr. Whitten had not previously informed Ms. Toney of the purpose for his visit. Upon questioning by Mr. Whitten, Ms. Toney determined that she did not have an open case file on petitioner. Mr. Whitten then showed her the copy of the return receipt. Ms. Toney, in Mr. Whitten's presence, then checked her file folder labeled "To be associated" and there found the envelope bearing the same certified mail number as the return receipt held by Mr. Whitten. Included in Ms. Toney's file, along with the envelope, was petitioner's October 6, 1986 letter to Ms. Toney and the two Forms 872-T. The notice of deficiency was issued to petitioner on August 14, 1987. Respondent *259 disallowed the partnership losses petitioner claimed with respect to ERL and VPL for 1980, 1981, and 1982. In his petition, petitioner alleged that respondent erroneously disallowed the ERL and VPL partnership losses. Petitioner further alleged that he was not liable for the various additions to tax determined by respondent in the notice of deficiency. Petitioner lastly asserted that the period of limitations for the assessment and collection of taxes for 1980, 1981, and 1982 had expired. OPINION Statute of limitations
Section 6501(a) provides generally that a deficiency in income tax shall be assessed within 3 years after a return is filed. However, under section 6501(c)(4), the parties may extend by agreement the 3-year period of limitations for assessment, "Where, before the expiration of the time prescribed [for assessment] * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time". Section 6501(c)(4) further provides that the extension so agreed may be extended by subsequent agreements in writing before expiration of the period previously agreed upon. Section 6501(c)(4) "refers only to time, and leaves the parties free *260 to decide for themselves the terms on which an extension * * * [to the statute of limitations] will be granted". Grunwald v. Commissioner, 86 T.C. 85, 88 (1986) (quoting Pursell v. Commissioner, 38 T.C. 263, 278 (1962), affd. per curiam 315 F.2d 629 (3d Cir. 1963)). A consent to extend the period for assessment of tax is essentially a unilateral waiver of a defense by a taxpayer and is not a contract. Grunwald v. Commissioner, supra at 89; Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983). Contract principles are significant, however, because section 6501(c)(4) requires that the parties reach a written agreement as to the extension. Grunwald v. Commissioner, supra at 89; Piarulle v. Commissioner, supra at 1042. Petitioner and respondent executed timely agreements which extended the applicable period of limitations for 1980, 1981, and 1982 within the intent and meaning of section 6501(c)(4). Petitioner contends that the last of such agreements terminated *261 on the 91st day after October 14, 1986, the date when the Internal Revenue Service received the Forms 872-T which petitioner mailed to revenue officer Marilyn Toney. Consequently, petitioner asserts, the respective limitation periods for 1980, 1981, and 1982 had expired prior to the date the notice of deficiency was issued. Petitioner thus claims that the assessment and collection of tax for his 1980, 1981, and 1982 tax years is barred. Respondent maintains that the period of limitations for 1980, 1981, and 1982 had not expired because the notice of deficiency was issued before the applicable limitation periods expired. Respondent asserts that the agreements which extended the periods of limitations were not terminated on the 91st day after October 14, 1986, because petitioner failed to properly effectuate a termination. Respondent further argues that the agreement which extended the limitations period for 1981 provided for an extension of time to a specified September 30, 1987, date certain and could not be terminated by petitioner's mailing of a Form 872-T. The agreements petitioner and respondent executed for 1980 and 1982 explicitly provide that the agreements could be terminated *262 by petitioner only through the receipt of a Form 872-T from petitioner by the "Internal Revenue Service office considering the case". The Form 872-T referenced in the agreements is an Internal Revenue Service form which contains mailing instructions advising the taxpayer to whom and to whose attention the completed Form 872-T is to be sent. Where the tax return to which the taxpayer's Form 872-T notice applies is under consideration by the Examination Division, the taxpayer is instructed to mail the Form 872-T addressed to the "Internal Revenue Service District Director having jurisdiction of the return(s), Attention: "Chief, Examination Division". The Court rejects petitioner's contention that the mere delivery of Form 872-T to the Birmingham district office's mailroom constituted receipt by the "Internal Revenue Service office considering the case". Contrary to the mailing instructions provided on the Form 872-T, petitioner mailed the Forms 872-T to Marilyn Toney, a revenue officer employed in the Collection Division of the Birmingham office. Both the mailing envelope and the enclosed letter were addressed to Ms. Toney. Ms. Toney was not employed in respondent's examination *263 division and had no knowledge of the workings of that office. See Burke v. Commissioner, T.C. Memo. 1987-325. Petitioner, however, maintains that his correspondence contained directions that the enclosed Forms 872-T be routed to the Examination Division. He refers to the return receipt form attached to the outside of the mailing envelope and to an alleged routing memorandum slip which was enclosed in and attached to the letter to Ms. Toney. The routing memorandum was addressed to Ms. Toney, with a block marked "For your information" and a typed message under "Remarks" stating "Please deliver the enclosed to the Chief, Examination Division." The Court has found as a fact that this routing memorandum was not attached to or included with petitioner's letter forwarding the Forms 872-T to Ms. Toney. Ms. Toney testified that no such routing information was included in petitioner's correspondence to her. The Court further has questioned, and has found as self-serving and not credible, the testimony petitioner and his secretary (now his wife) gave concerning the routing memorandum. More importantly, the attachment of the purported routing memorandum was *264 totally inconsistent with the statements contained in petitioner's cover letter to Ms. Toney. In the letter, petitioner advised Ms. Toney that the enclosed "Forms 870-T" were for Ms. Toney's case file on Mr. Coggin and stated that she had previously suggested they be returned to her by Mr. Coggin. Petitioner ended the letter by thanking Ms. Toney for her prior assistance in concluding petitioner's Collection Division case. Upon questioning by the Court, petitioner could give no satisfactory explanation for these statements in his letter to Ms. Toney -- if, in fact, petitioner meant to have the enclosed Forms 872-T routed to someone else. The Court can only conclude that petitioner intended to, and did in fact, mislead Ms. Toney. Petitioner is an experienced attorney. He previously represented clients before the Internal Revenue Service and was aware of the separate functions performed by the Collection Division, in which Ms. Toney was employed, and the Examination Division, to which he allegedly intended to have the Forms 872-T routed. Although the return receipt attached to the outside of the certified mailing envelope had language indicating the correspondence was mailed *265 to the chief of the Examination Division, the address on the envelope clearly was not directed to the chief of respondent's Examination Division. Petitioner knew that the return receipt on certified mail is not retained by the recipient or addressee but, rather, is returned to the sender. Petitioner also knew that the address on the return receipt is prepared by the sender and should conform to the address shown on the certified parcel. Respondent is not held, as petitioner contends, to constructive notice of the address shown on the return receipt where that address is different from the address on the certified mailing envelope simply by the fact that a mailroom employee signed the return receipt accepting delivery of the certified mail. Under these circumstances, the Court is unwilling to conclude that the Forms 872-T were received on October 14, 1986, by respondent's "office" considering petitioner's 1980 and 1982 returns. At earliest, the Forms 872-T were received by the "Internal Revenue Service office considering the case" on July 1, 1987, when Mr. Whitten received the forms from Ms. Toney. The Court further holds that petitioner, under the terms of the agreement extending *266 the period of limitations for 1981, could not terminate that agreement's existence prior to the agreed September 30, 1987, expiration date through the mailing of a Form 872-T. Unlike the Forms 872-A which petitioner and respondent executed for 1980 and 1982, the Form 872 for 1981 did not permit the taxpayer to terminate the agreement's existence. Consequently, the Court concludes that the period of limitations under section 6501 on assessment and collection of tax for 1980, 1981, and 1982, had not expired prior to the time respondent issued the notice of deficiency. Respondent, therefore, is sustained on the statute of limitations issue. Advanced royalties
ERL and VPL claimed substantial deductions on their respective 1980, 1981, and 1982 returns, which were attributable to "accrued advance royalties". The Court has previously held, in cases involving these same partnerships, that the royalty obligations of each partnership were not "substantially uniform" and were not "paid at least annually" and, therefore, are not deductible as advanced royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs.Bauman v. Commissioner, T.C. Memo. 1988-122; *267 Walden v. Commissioner, T.C. Memo. 1988-98. In the instant case, the facts with respect to this issue have not changed and are identical to the facts presented to the Court in Bauman v. Commissioner, T.C. Memo. 1988-122, and Walden v. Commissioner, T.C. Memo. 1988-98. The Court, for the reasons stated therein in those cases, holds that each partnership's "royalty obligations" are not deductible as advanced royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs.
Economic substance of partnership lease transactions; bona fide indebtedness
In Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989), this Court noted the numerous cases which hold that transactions which are devoid of economic substance should be disregarded for tax purposes, stating: We have recently summarized the holdings of such cases by stating: A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase *268 or is otherwise fictitious ( Falsetti v. Commissioner, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects ( Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361, 366 (1960)). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance-features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. at 583-584; Estate of Thomas v. Commissioner, 84 U.S. 412 (1985); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). It must be recognized that the tax laws affect the shape of every business transaction. The parties to a transaction are entitled to maximize favorable tax results so *269 long as the transaction is compelled or encouraged by non-tax business reasons. Frank Lyon Co. v. United States, 435 U.S. at 580. [James v. Commissioner, 87 T.C. 905, 918 (1986).]
Key indicators of presence or a lack of economic substance include presence or absence of arm's length price negotiations, the relationship between the sales price and fair market value, the structure of financing of the transaction, whether there was a shifting of the benefits and burdens of ownership, and the degree of adherence to contractual terms. See, e.g., Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Zirker v. Commissioner, 87 T.C. 970 (1986); Helba v. Commissioner, 87 T.C. 983 (1986); James v. Commissioner, supra; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981).
Although a transaction may not be "a mere paper chase or otherwise fictitious", Rose v. Commissioner, 88 T.C. at 415, *270 the transaction is to be disregarded if it is found to be devoid of economic substance consonant with its intended tax effects. Ferrell v. Commissioner, 90 T.C. 1154, 1198-1199 (1988). Respondent determined in this case that the respective lease transactions of ERL and VPL lacked economic substance. Accordingly, petitioner has the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioner failed to offer any testimony from Mr. McIntyre, the promoter and managing general partner of both ERL and VPL. No explanation was given for this failure to have Mr. McIntyre appear and testify. Petitioner also failed to offer any expert evidence to establish the estimated recoverable coal reserves on the properties subject to the respective coal leases or the fair market value of each partnership's coal lease rights. [6] See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1154, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). *271 In contrast, respondent offered the testimony of an expert on these aspects of the case. Respondent's expert estimated that the land subject to the ERL coal lease contained only 17 million tons of demonstrated coal reserves, and not the estimated 52 million tons in economically recoverable coal represented by Mr. McIntyre, ERL's managing general partner, in the ERL private placement offering materials. Respondent's expert noted that there were numerous flaws or inadequacies contained in the Coal Reserve Report included in the offering materials. Similarly, respondent's expert estimated that the land subject to VPL's sublease contained only 4,363,000 tons of proven coal reserves, and not the minimum 40 million tons of economically recoverable reserves represented by Mr. McIntyre in the VPL private placement offering materials. Based on respondent's expert witness and other credible evidence of record, the Court concludes that the "royalty obligations" of each partnership greatly exceeded the fair market value of each partnership's rights under its respective coal property leases. Petitioner did not sustain his burden of establishing that the partnerships' royalty obligations *272 were reasonably commensurate with the fair market value of the coal which could be expected from the leases. In a July 30, 1977 transaction, ERL's "lessor" acquired the land covered by ERL's "lease" for a stated cash price of $ 3,750,000. Moreover, the firm issuing the coal reserve report, included in ERL's offering materials, previously valued the same coal property at approximately $ 3.5 million in its March 14, 1975 report. Petitioner failed to offer any convincing evidence establishing that the coal property's fair market value had so greatly appreciated to an amount, as of the December 1, 1980 date of ERL's "coal lease", which would justify the partnership's agreement to "pay" $ 200 million in "minimum royalties" during the initial 20-year period of its "lease". Similarly, petitioner failed to establish that the fair market value of the coal property covered by VPL's "lease" even approached the $ 166.8 million in "minimum royalties" VPL would "pay" during the initial 20-year period of its "lease". [7]
*273 The "minimum royalty obligations" of the partnerships were not reasonably comparable to those provided under similar leases in the Harlan County, Kentucky, or Lee County, Virginia areas. At trial, the individual who had been employed to manage each partnership's mining operations, and who had personal knowledge of the coal business in that part of the country from his family's coal business, admitted on cross-examination that the largest minimum royalty he knew of under a coal lease (other than the coal leases involving the coal partnerships Mr. McIntyre organized and operated) involved a lease which required a minimum royalty of $ 200,000 a year on an 80,000-acre tract of land. This witness also claimed that ERL's and VPL's "minimum royalty obligations", while many times higher, were justified because each partnership could defer payment on each year's minimum royalty for up to 30 years. Indeed, the form of the notes each partnership would purportedly issue for its "minimum royalty obligations" appears foreign to the business world. Each "note" would be "payable" 20 years from the date of the "note", but "payment" could be deferred for up to another 10 years at the option of *274 either the payee or the maker. While the notes purportedly to be issued by ERL would bear "interest" at 6 percent per annum, no partner of ERL (general or limited) would be personally liable for "payment" of the "interest" due. With respect to the notes purportedly to be issued by VPL, no "interest" would "accrue" or be "payable" prior to each "note's" "maturity date". Additionally, with respect to "payment" of "principal", all of the "notes", except those "recourse notes" purportedly issued by each partnership with respect to its first two or first three "minimum royalty payments", would be "nonrecourse". See Ferrell v. Commissioner, 90 T.C. at 1154. These notes are certainly not the type of obligations freely and commonly used in commerce or by banks and other financial institutions. See further Rose v. Commissioner, 88 T.C. at 419-421. [8]
*275 Moreover, the Court is not convinced that the "notes", which purportedly were to be issued by each partnership with respect to its annual "minimum royalty payments", represented bona fide indebtedness. At trial, petitioner failed to offer any convincing evidence establishing that payment of the "recourse" and "nonrecourse notes" was reasonably likely. See generally Waddell v. Commissioner, 86 T.C. 848, 900-903 (1986), affd. per curiam on other issues 841 F.2d 264 (9th Cir. 1988). Petitioner failed to convince the Court that actual prospects existed for each partnership to generate sufficient revenue, from the mining of coal under its "lease" or from other exploitation of its "coal lease rights", to meet "royalty obligations" and earn profits. Over the initial 20-year period of their respective "leases", ERL would "incur" "minimum royalty obligations" totaling $ 200 million and VPL would "incur" "minimum royalty obligations" totaling $ 166.8 million. In summary, petitioner failed to establish that each partnership's transaction had any practicable economic effect other than the creation of tax benefits. See Karr v. Commissioner, 924 F.2d 1018, 1023 (11th Cir. 1991), *276 affg. 91 T.C. 733 (1988). Consequently, the Court, for the foregoing reasons, sustains respondent's determinations that each partnership's lease transaction lacked economic substance. Profit objective
In the notice of deficiency, respondent determined that ERL's and VPL's activities were not engaged in for profit. The burden of proof on this issue also rests on petitioner. Rule 142(a). For petitioner to be entitled to the deductions claimed with respect to his investments in ERL and VPL, each partnership, among other things, must have undertaken its activity with an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the expectation of profit need not have been reasonable, the activity must have been entered into, or continued, with the bona fide objective of making a profit. Taube v. Commissioner, 88 T.C. 464, 478-479 (1987). Profit in this context means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986). *277 The determination is to be made at the partnership level. Brannen v. Commissioner, 722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Taube v. Commissioner, 88 T.C. at 478. In making this determination in the case of a limited partnership, the proper focus is on the actions of the promoter and general partner. Brannen v. Commissioner, 722 F.2d at 705-706 n.10 and 78 T.C. at 505, 508-512; Seaman v. Commissioner, 84 T.C. 564, 589 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). Profit objective is a question of fact and is to be determined from all the facts and circumstances. Dreicer v. Commissioner, 78 T.C. at 645. More weight is given to objective facts than to mere self-serving statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Siegel v. Commissioner, 78 T.C. 659, 699 (1982). The regulations under section 183 list nine factors that *278 should be taken into account in determining whether an activity is engaged in for profit. Sec. 1.183-2(b), Income Tax Regs. No one factor is determinative, and the regulations recognize that the nine factors listed are not the only factors which may be taken into account. For largely the same reasons recited above in sustaining respondent's determinations that ERL's and VPL's respective lease transactions lacked economic substance, the Court also concludes that petitioner failed to establish that each partnership's activity was engaged in with an actual and honest objective of making a profit. After looking past petitioner's self-serving testimony and the self-serving representations of the promoter of the coal lease program contained in the offering materials, the Court has not been convinced that economic profit for each partnership and its partners, rather than the securing of tax deductions, was the objective behind the formation of each partnership's program. As noted earlier Mr. McIntyre, who was the promoter and each partnership's managing general partner, did not appear and testify at trial. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *279 affd. 162 F.2d 513 (10th Cir. 1947). In lieu of Mr. McIntyre, petitioner relied heavily on the testimony of an individual hired by Mr. McIntyre to manage each partnership's coal mining activities. Considerably diminishing this witness's testimony, however, was his acknowledgement, on cross-examination, that each partnership's "minimum royalty obligations" were not reasonably comparable to the minimum royalty payments required under any other coal leases the witness knew of. Such testimony calls into substantial question, and appears to directly contradict, the representations Mr. McIntyre made, in each partnership's offering materials, that the partnership's "royalty obligations" were reasonable in amount and in accordance with customary business practice. Moreover, this witness' testimony lends further support to this Court's conclusion that the partnerships' recourse and nonrecourse notes were not reasonably likely to be paid. Petitioner produced no convincing evidence establishing the validity of certain other highly relevant representations of Mr. McIntyre referred to in the tax opinions which accompanied the offering materials of each partnership. *280 Among such representations made to investors were Mr. McIntyre's claims that: (1) The fair market value of each partnership's "coal lease rights" substantially exceeded its "minimum royalty obligations", and (2) each partnership possessed the capability to generate sufficient revenues from its mining of coal to discharge its "minimum royalty obligations". Yet, over the initial 20-year period of their respective "leases", ERL would "incur" total "minimum royalty obligations" of $ 200 million and VPL would "incur" total "minimum royalty obligations" in excess of $ 166.8 million. See Brannen v. Commissioner, 78 T.C. at 508. On this record, the Court sustains respondent's determination that each partnership's activity was not engaged in for profit. The Court therefore finds it unnecessary to address the other grounds respondent determined for disallowing the deductions petitioner claimed with respect to ERL and VPL for 1980, 1981, and 1982. Petitioner alternatively claimed that the amounts paid or accrued under the annual royalty provisions of the leases of VPL and ERL constituted deductible mine development expenses under section 616. Section 616(a) *281 provides, in part, that there shall be allowed as a deduction all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit, other than an oil or gas well, if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. See Anderson v. Commissioner, 83 T.C. 898 (1984), affd. without published opinion 846 F.2d 76 (10th Cir. 1988). In Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986), this Court held that a deduction under section 616(a) is premised on a finding that the activity giving rise to the deduction is an activity engaged in with the objective of making a profit. Having found that VPL's and ERL's activities were not engaged in for profit, petitioner is precluded from claiming any deduction under section 616(a). However, even if the activities of VPL and ERL were engaged in for profit, petitioner failed to establish that the royalty obligations constituted development expenses within the intent and meaning of section *282 616(a). In Geoghegan & Mathis, Inc. v. Commissioner, 55 T.C. 672, 676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972), this Court held that an expenditure to acquire a right of access to a mine did not constitute a mine development expense, but rather represented an additional investment in the mine, a capital expenditure. In so holding, this Court followed Santa Fe Pacific Railroad v. United States, 378 F.2d 72, 76 (7th Cir. 1967), wherein the term "development" was defined to mean those expenditures designed to prepare a mineral deposit for extraction or exploitation and includes those expenses to make a mineral deposit accessible for mining, such as stripping the overburden and constructing means for its removal in the case of open pit mining, or sinking shafts and installing raises, tracks, or pumps in the case of underground mining. Petitioner did not establish that the claimed expenditures constituted mine development expenses under section 616(a). There are, however, certain adjustments which may be warranted in favor of petitioner. As noted earlier, in the notice of deficiency, respondent *283 disallowed deductions of $ 43,629, $ 23,411, and $ 392, purportedly claimed by petitioner, respectively, for 1980, 1981, and 1982, from his investment in VPL. The record shows that petitioner claimed losses of $ 40,829 and $ 21,775, respectively, from VPL for 1980 and 1981 and claimed no losses from VPL on his 1982 return. In the final resolution of this case, the parties should reconcile as part of the Rule 155 computation respondent's adjustments in the notice of deficiency with the amounts deducted by petitioner on his returns for the years in issue in respect of VPL. Additions to tax
Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1982 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition to tax of 50 percent of the interest on that portion of the underpayment attributable to negligence. Negligence under section 6653(a) is the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), *284 affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). An addition to tax under section 6653(a) was determined against petitioner for 1980 and additions to tax under section 6653(a)(1) and (2) were determined against petitioner for 1981 and 1982. Petitioner bears the burden of proof in establishing that he was not liable for such additions to tax. Rule 142(a). Petitioner contends that he relied on the professional advice of a national accounting firm which prepared ERL's and VPL's 1980, 1981, and 1982 information returns, and on the coal mining reports prepared by employees of the partnerships and other individuals associated with the promoter. The Court finds petitioner's testimony self-serving and, moreover, questions whether petitioner, in fact, had any good faith and reasonable basis for relying on such alleged advice in claiming deductions from ERL and VPL on his 1980, 1981, and 1982, individual returns. Petitioner testified he understood that the accounting firm had extensively researched the allowability of the deductions claimed under the coal investment programs. It was not established, however, *285 whether the accountants had any firsthand knowledge or knew all of the relevant facts concerning each partnership's coal lease venture. See Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988), affg. T.C. Memo. 1987-217. Petitioner also claims to have relied on the mining reports prepared by other individuals associated with the promoter or by the partnerships' employees. These individuals, however, were not outside, unbiased, objective advisors. Petitioner was neither a misguided investor, nor unsophisticated in tax law. Petitioner was intimately involved in the promotion and operation of ERL and VPL. Petitioner prepared the tax opinions included in the ERL and VPL offering materials. Petitioner had a generalized knowledge about the coal industry and had helped the promoter negotiate the coal lease agreements which ERL and VPL entered. He performed other legal work for ERL and VPL as well. Although reliance on the advice of professionals may defeat a finding of negligence, the Court holds that petitioner has not shown the purported reliance in the instant case was reasonable. See Freytag v. Commissioner, 89 T.C. 849, 889 (1987), *286 affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.     (1991). Consequently, respondent's determinations that petitioner is liable for the addition to tax under section 6653(a) for 1980 and additions to tax under section 6653(a)(1) and (2) for 1981 and 1982 are sustained. Section 6659 provides for an addition to tax for underpayments of tax attributable to valuation overstatements. A valuation overstatement exists, among other situations, if the adjusted basis of property claimed on any return equals or exceeds 150 percent of the correct amount of the basis. No addition is imposed under section 6659 unless the underpayment in tax attributable to the valuation overstatement is at least $ 1,000. To the extent a taxpayer claims deductions that are disallowed on grounds separately and independently from the alleged valuation overstatements, the resulting underpayments are not regarded as "attributable to valuation overstatements". Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). For instance, where certain agreed payments are not deductible as advance royalties *287 under section 1.612-3(b), Income Tax Regs., because they fail to meet certain requirements of the regulations, the taxpayer -- regardless of any alleged valuation overstatements -- is not entitled to any deductions with respect to such agreed payments. Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, 92 T.C. 827, 851-855, 859-860 (1989); Todd v. Commissioner, supra; see Ferrell v. Commissioner, 90 T.C. at 1203-1204. Respondent determined that petitioner is liable for additions to tax for valuation overstatements under section 6659 for 1981 and 1982 because petitioner, on his returns, overstated the adjusted basis for his partnership interest in ERL and his adjusted basis in VPL. Respondent asserts that the basis figures claimed on the returns included petitioner's pro rata share of various recourse notes each partnership purportedly issued. Respondent claims petitioner's actual adjusted basis in his partnership interests was far less than the basis amounts petitioner reported, *288 and, for that reason, petitioner is liable for additions to tax under 6659. The Court has sustained respondent's disallowance of the deductions petitioner claimed with respect to ERL and VPL on several grounds. These grounds included: (1) The "royalty obligations" of each partnership under its lease agreement not being "substantially uniform" and not "paid at least annually" and, therefore, not qualifying to be deducted as advance royalties accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs.; (2) petitioner's failure to establish that each partnership's coal lease transaction had economic substance; and (3) petitioner's failure to establish that each partnership's activity was engaged in for profit. None of these grounds, however, necessarily turned on the value or overvaluation of petitioner's partnership interests. The Court concludes that the adjusted basis of petitioner's partnership interests is too attenuated to these grounds upon which it has sustained the disallowance of petitioner's claimed partnership deductions to support the imposition of section 6659 additions to tax. McCrary v. Commissioner, 92 T.C. at 851-855, 859-860. *289 See Ferrell v. Commissioner, 90 T.C. at 1203-1204. Petitioner, therefore, is sustained on the additions to tax under section 6659. Respondent determined that petitioner is liable for an addition to tax for substantial understatement for 1982. In order for an understatement of tax to be considered substantial, the amount must exceed the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Respondent contends that the addition under section 6661 should be imposed because, under section 6661(b)(2)(B)(i) and (ii), there was no substantial authority supporting the claimed treatment of the disallowed items, and because petitioner did not adequately disclose on his return the relevant facts concerning the disallowed items. Petitioner argues that, even if he is otherwise determined to be liable for the section 6661 addition to tax, respondent should waive the addition. The Court notes that, in the case of any item attributable to a tax shelter, adequate disclosure will not serve to reduce the understatement (section 6661(b)(2)(C)(i)(I)), nor will substantial authority do so unless the taxpayer reasonably *290 believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment (section 6661(b)(2)(C)(i)(II)). In any event, petitioner has not established that he had substantial authority supporting his treatment of the disallowed items, nor did he adequately disclose on his return the relevant facts concerning the disallowed items. He further has not shown that he reasonably believed his treatment of the disallowed items was more likely than not the proper treatment. Petitioner has not established that respondent's discretion was abused in not waiving the section 6661 addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Assuming the section 6661(b)(1)(A) threshold amount is met, petitioner is liable for the section 6661 addition to tax for 1982. Additional interest
Section 6621(c) provides for an increased rate of interest with respect to any "substantial underpayment" of tax in any taxable year "attributable to 1 or more tax motivated transactions" if the amount of the underpayment for such year so attributable exceeds $ 1,000. Section 6621(c)(3)(A) generally lists the types of transactions *291 which are considered "tax motivated transactions". Under section 6621(c)(3)(A)(v), a "tax motivated transaction" includes any sham or fraudulent transaction. Additionally, section 6621(c)(3)(B) authorizes the Secretary by regulation to specify additional types of transactions which will be treated as tax-motivated transactions. Section 301.6621-2T, Q and A-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), states that any deductions disallowed for any period under section 183 are considered to be attributable to a tax-motivated transaction. As with the section 6659 addition to tax, the section 6621(c) increased rate of interest does not apply to deductions disallowed on separate and independent grounds which do not fall within the specified categories of tax-motivated transactions. McCrary v. Commissioner, 92 T.C. at 858-860. Here, the Court sustained the disallowance of the deductions claimed as advanced minimum royalty payments under section 1.612-3(b), Income Tax Regs. The basis for disallowance of the advanced minimum royalty payments is independent of and separable from the tax-motivated transactions *292 upon which the other deductions of VPL and ERL were disallowed. Therefore, to the extent that petitioner's underpayment of tax is attributable to the disallowed advanced minimum royalty payments, petitioner is not liable for the increased interest under section 6621(c). However, all other disallowed deductions from VPL and ERL for 1980, 1981, and 1982 were sustained on the grounds of economic sham and lack of profit objective. Petitioner will be liable for increased interest under section 6621(c) for the underpayment in tax attributable to these adjustments, if the underpayments for each year exceed $ 1,000. Because of the pendency of other unrelated matters which remain at issue (see supra note 2), An appropriate order will be issued.
Footnotes
1. All section references are for the Internal Revenue Code for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Trial of this case was limited to adjustments relating to Energy Resources, Ltd., and Virginia Partners, Ltd., and whether the statute of limitations under sec. 6501↩ barred the assessment and collection of taxes against petitioner for all years at issue. In addition to the adjustments relating to the two partnerships, there remain other unrelated adjustments which were not heard and remain at issue.
1. For 1980, the determination was made under sec. 6653(a).↩
2. 50 percent of the interest due on the $ 34,619.39 portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
3. 50 percent of the interest due on the $ 28,451.79 portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
3. The use of such words as "lease", "lessor", "lessee", "sublease", "sublessor", "sublessee", "ERL coal property" and "VPL coal property", are for convenience and are not intended as ultimate findings concerning the character of the transactions entered into. Similarly, the use of terms such as "interest", "nonrecourse" and "recourse", in connection with promissory notes, or "royalty obligation" in connection with coal lease agreements, should not be construed as conveying any conclusion as to the legal effect of the obligations involved.↩
1. The cash was payable $ 20,000 at subscription and $ 20,000 on or before Feb. 1, 1980. The total cash would be $ 5,480,000 if the maximum number of units subscribed and $ 4,000,000 if the minimum number of units subscribed.↩
2. VPL executed recourse notes of $ 8,100,200 and $ 8,220,200, totaling $ 16,320,400, payable to the sublessors of the coal property for the first two minimum advanced royalties. Each investor in VPL executed a note and assumption agreement for a ratable or proportionate part of VPL's $ 16,320,400 indebtedness.↩
4. A separate consideration was agreed to for the two corporations to be purchased by VPL.↩
5. According to the Coal Reserve Report discussed infra↩, the tract to be leased had an actual size of about 5,300 acres, rather than the approximately 3,900 acres previously believed. The difference in these acreage figures is not material to this case.
1. In addition, petitioner was allocated a sec. 1231 loss of $ 238 for 1982.↩
2. Petitioner was allocated an additional sec. 1231 loss of $ 15 for 1982.↩
6. At trial, petitioner attempted to introduce into evidence certain reports which allegedly had been previously prepared or furnished by consultants to the partnerships. The Court, however, refused to allow the reports in evidence because the individuals who had prepared the reports were not present to authenticate the reports or to be cross-examined. It is not entirely clear to the Court whether petitioner was attempting to offer these reports as expert testimony. In any event, these reports would not be admissible as expert testimony. See Rule 143(f).↩
7. Even though the limited partners paid cash and executed notes only for the first 3 years of each partnership's lease, the partnerships executed nonrecourse notes to their lessors as advanced royalties for the 4th through the 20th years of each lease, which accounts for the millions of dollars noted.↩
8. The Court conditions or qualifies references to the notes as "purported" or "would be issued" for the reason that the notes were never introduced into evidence and, since Mr. McIntyre, the managing general partner of the partnerships, did not testify, petitioner did not establish as a fact that ERL and VPL issued notes. In this discussion, and throughout this opinion, the Court assumes the notes were issued.↩